**RANSBURG ELECTRO-COATING CORP., Plaintiff,**

v.

**FORD MOTOR COMPANY, Defendant.**

**No. IP 62–C–157.**

United States District Court
S. D. Indiana,
Indianapolis Division.

July 16, 1965.

Thompson, O'Neal & Smith, Trask, Jenkins, & Hanley, Indianapolis, Ind., Hume, Groen, Clement & Hume, Chicago, Ill., for plaintiff.

Buschmann, Carr, Schabel & Tabbert, Indianapolis, Ind., Hibben, Noyes & Bicknell, Chicago, Ill., for defendant.

HOLDER, District Judge.

Trial of this action was commenced on November 30, 1964, required twenty

(20) days in December, 1964, nine (9) days in February, 1965, and was concluded on March 15, 1965. The action was submitted upon the plaintiff's complaint filed April 20, 1962, as amended in the pre-trial conference of September 13, 1963, as amended on August 4, 1964 by plaintiff's declaration in compliance with the pre-trial conference order, and as amended November 9, 1964, and the issues joined with the amended complaint by defendant's answer of March 26, 1963, as amended in the pre-trial conference of September 13, 1963, as amended on October 6, 1964 by defendant's declaration in compliance with the pre-trial conference order of September 13, 1963, as amended on October 6, 1964, November 4, 10, 13, 1964, and as amended in the pre-trial conference of November 30, 1964, and the issues joined with the defendant's November 4, 1964 amended answer by plaintiff's reply of November 4, 1964.

The parties submitted briefs in lieu of final arguments. The briefing schedule and tender of proposed findings of fact and conclusions of law was concluded on May 13, 1965.

The Court being advised in the matter does now submit its findings of fact and conclusions of law on all issues except the issue of damages which was severed from the trial issues.

## FINDINGS OF FACT

1. The plaintiff, Ransburg Electro-Coating Corp., is now and when this action was commenced a corporation. It was incorporated under the laws of the State of Indiana and had its principal office and place of business at 3939 West 56th Street, Indianapolis, Indiana, when the action was commenced on April 20, 1962.

2. The defendant, Ford Motor Company, is now and was, when this action was commenced, a corporation. It was incorporated under the laws of the State of Delaware and had a regular and established place of business at 6900 English Avenue, Indianapolis, Indiana, when the action was commenced on April 20, 1962.

3. The United States Patent Office on August 3, 1954 issued to plaintiff United States Letters Patent No. 2,685,536 for an invention in a Method for Electrostatically Coating Articles. The plaintiff was, on the date of issuance and has been continuously since, the owner of the issued patent.

The inventors were William A. Starkey and Edwin M. Ransburg who assigned their interests, by mesne assignments, to the plaintiff.

The application for this patent (Serial No. 556,390 assigned by the United States Patent Office) was filed on September 29, 1944 with the United States Patent Office.

4. The United States Patent Office on June 4, 1957 issued to plaintiff United States Letters Patent No. 2,794,417 for an invention in an Apparatus for Electrostatically Coating Articles. The plaintiff was, on the date of issuance and has been continuously since, the owner of the issued patent.

The inventors were William A. Starkey and Edwin M. Ransburg who assigned their interests, by mesne assignments, to the plaintiff.

The original application for this patent (Serial No. 556,390 assigned by the United States Patent Office now Patent Number 2,685,536 and referred to in item three of these findings) was filed on September 29, 1944 with the United States Patent Office. It was divided and the application for this patent (Serial No. 434,366 assigned by the United States Patent Office) was filed June 4, 1954 with the United States Patent Office.

5. The United States Patent Office on July 7, 1959 issued to plaintiff United States Letters Patent No. 2,893,893 for an invention in a Method and Apparatus for Electrostatic Coating. The plaintiff was, on the date of issuance and has been

continuously since, the owner of the issued patent.

The inventor was William W. Crouse who assigned his interests, by mesne assignment, to the plaintiff.

The application for this patent (Serial No. 141,509 assigned by the United States Patent Office) was filed on January 31, 1950 with the United States Patent Office.

6. The United States Patent Office on July 7, 1959 issued to plaintiff United States Letters Patent No. 2,893,894 for an invention in a Method and Apparatus for Electrostatically Coating. The plaintiff, was, on the date of issuance and has been continuously since, the owner of the issued patent.

The inventor was Edwin M. Ransburg who assigned his interests, by mesne assignment, to the plaintiff.

The application for this patent (Serial No. 771,505 assigned by the United States Patent Office) was filed on November 3, 1958 with the United States Patent Office. The application is a continuation of an application (Serial No. 143,994 assigned by the United States Patent Office) which was filed February 13, 1950 with the United States Patent Office.

7. Copies of the four (4) patents referred to in items three (3), four (4), five (5), and six (6) of these findings are attached hereto, made a part hereof and are identified respectively as Exhibits "A", "B", "C", and "D".

8. The defendant at all times in question has been aware of the following litigation concerning the patents referred to in item seven (7) of these findings and closely and diligently observed and followed such including the making-up of the issues at the trial level thereof with qualified legal, engineering and executive personnel. The defendant, due to the quantity of its production, transacted business with many suppliers of paint and equipment for the application thereof which included among many others Binks Manufacturing Company, Proctor Electric Company, Inc. and Ionic Electrostatic Corporation of New Jersey (Ionic

is referred to in rhetorical paragraph twelve (12) (c), page thirteen (13) of the defendant's answer filed March 26, 1963 and page seventeen (17) of the answer of October 6, 1964).

When Binks Manufacturing Company was unable to do business with Ford Motor Company unless it furnished protection of Ford Motor Company from potential liability to Ransburg Electro-Coating Corp. for infringement of Ransburg patents 536 and 417, it commenced a declaratory judgment action against Ransburg Electro-Coating Corp. These two (2) patents were held valid and infringed. Binks Manufacturing Company v. Ransburg Electro-Coating Corp., 7 Cir., 281 F. 2d 252; 364 U.S. 926, 81 S.Ct. 353, 5 L. Ed.2d 265; 366 U.S. 211, 81 S.Ct. 1091, 6 L.Ed.2d 239.

The four (4) patents in issue in the instant case and referred to in item seven (7) of these findings were held valid and infringed. Ransburg Electro-Coating Corp. v. Proctor Electric Company, Inc. and Ionic Electrostatic Corporation, D. C., 203 F.Supp. 235; 4 Cir., 317 F.2d 302.

9. The plaintiff had its origin in an individual proprietorship. Mr. Harper J. Ransburg was engaged in the manufacture and sale of houseware items and was assisted by his three (3) sons, Gregg, Harold and Edwin. In 1941, they formed a partnership doing business under the firm name and style of Harper J. Ransburg Co. which continued the business of the individual proprietorship but also commenced the marketing of a "detearing" system, in which electrostatic forces were used to remove the "tears" of excess paint which accumulate on the lower edges of dipped or flow coated articles and a process referred to herein as the "No. 1 Process" in which paint which was sprayed from essentially conventional compressed-air spray guns was electrostatically deposited on articles intended to be coated.

When the plaintiff was incorporated on January 1, 1948, the corporation took over the business of marketing the "No. 1 Process" and the "detearing" systems

and the partnership retained the business of manufacture and sale of housewares.

Before the development of the Ransburg "No. 1 Process", Mr. Ransburg's personnel painted products by the well known system in which a spray of paint formed by and projected from a conventional compressed-air spray gun was directed toward articles to be painted. This system is still widely used. When this system is used much of the material sprayed is not deposited upon the article intended to be coated but is carried beyond the article by the blast of air and the paint or coating material is lost in "overspray". This system necessitated a substantial expenditure in installing, maintaining, and operating spray booths, oversprayed material collecting devices, and exhaust systems.

Commencing in about 1937, the Ransburgs conducted experiments in using a high-voltage electrostatic field to deposit more efficiently upon articles a coating material atomized by the conventional compressed-air spray gun. From this, the Ransburg "No. 1 Process" in which coating material was sprayed by means of compressed-air spray guns into an electrostatic field maintained between wires or electrodes and articles (intended to be coated) moving on a conveyor system in one of the phases of manufacture of the article. A potential of approximately 100,000 volts was applied to the electrode to establish the field with the articles grounded through the conveyor. When the paint particles entered the established field, they then became electrically charged and by the effect of the field thereafter were moved toward and deposited upon the articles. The Ransburg "No. 1 Process" was a material and useful improvement over the conventional compress-air spray methods (without the electric field) as it materially reduced loss of paint by overspray and other expenses.

The partnership (Harper J. Ransburg Co.) marketed the Ransburg "No. 1 Process" in the year 1943 or 1944 as the first commercially-used electrostatic spray painting system.

The Ransburg "No. 1 Process" was devised to reduce the cost of coating of manufactured articles.

The defendant was acquainted with this Ransburg "No. 1 Process" for many years and knew of their marketing the process.

10. Despite the improvement in coating by the use of Ransburg "No. 1 Process" as compared to the conventional compressed-air spray systems, there was still substantial loss of coating material in many manufacturing operations because the electrostatic field was unable to prevent the escape of the coating particles from the field by the force of the compressed-air spray carrying the coating material other than upon the articles in manufacture. Experience in the use of the Ransburg "No. 1 Process" disclosed that paint loss could exceed one-fourth ($\frac{1}{4}$) of the paint used, and because of the overspray expensive booths and other equipment was still required to control the wasted paint and prevent damage to humans and property within and outside of the manufacturing plant.

The partnership (Harper J. Ransburg Co.) because of such experience conducted further research and development and as a result the Ransburg "No. 2 Process" was developed. The process made it possible for articles to be coated electrostatically without the necessity of a compressed-air spray gun to atomize the coating material. In many manufacturing operations, the Ransburg "No. 2 Process" eliminates the overspray of coating material, reduces loss of expensive coating material and other costs, and also substantially reduces investments in spray booths, exhaust systems, and related equipment.

In 1949, an agreement was entered into with the Enameled Steel and Sign Company of Chicago, Illinois, for special consulting and research purposes and concerned the Ransburg "No. 2 Process". This was the first license of the process by the plaintiff. Commencing in 1951, the "No. 2 Process" was offered to the general market.

The Ransburg "No. 2 Process" has been and still is commercially successful with more than one thousand six hundred (1600) licenses having been granted with substantial fees having been paid and are continuing to be paid plaintiff by its licensees.

The plaintiff is still in the business of marketing systems using electrostatic forces in the application of paint or other liquid coating to articles of manufacture carried by conveyors. The two (2) coating systems are the Ransburg "No. 1 Process" and the "No. 2 Process". In addition, plaintiff is still in the business of marketing Ransburg's "detearing" system.

The Ransburg electrostatic coating systems were devised to reduce the cost of coating by the non-electrostatic air spray methods.

11. Diligent efforts were made by plaintiff to market the Ransburg "No. 2 Process" to the defendant but defendant chose to follow a program of developing its own method and apparatus and experimenting in the electrostatic coating field. This course of conduct was undertaken while the plaintiff was fully engaged in legal actions with the defendant's suppliers. Defendant developed, established and used the accused method and apparatus in its established place of business at 6900 English Avenue, Indianapolis, Indiana, and at various locations within the United States of America in other of its regular and established places of business. When the defendant failed and refused to do business with plaintiff and persisted in the use of the accused method and apparatus, the plaintiff commenced this infringement action on April 20, 1962.

Pending the case, the defendant has extended the use of the accused method and apparatus to other plants of defendant.

Following the disposition of the decision of the Court of Appeals in the Ransburg Electro-Coating Corp. v. Proctor Electric Company, Inc. and Ionic Electrostatic Corporation, 4 Cir., 317 F.2d 302,

the defendant entertained settlement discussions with the plaintiff and these were concluded. Out of which private compromise talks, the defendant leveled another defense against plaintiff's action of an alleged attempted package licensing which defense was filed November 4, 1964 and was denied by the plaintiff in its reply of November 6, 1964.

The plaintiff, thereafter on November 9, 1964, filed amendments to its complaint which included additional charges in support of its claim for damages (a severed issue) and for injunctive relief (a part of the issues of this trial) alleging that the infringements "were and continue to be deliberate, willful and wanton infringements and plaintiff has been and is being deliberately required by defendant to engage in vexatious and expensive litigation in flagrant disregard of plaintiff's rights".

12. The Ransburg "No. 2 Process" is based upon the teachings of the patents in issue referred to in finding seven (7). There are several forms of systems taught by the patents. In all systems, paint or other liquid coating material supplied to an atomizing head is fed at a controlled rate to, and distributed along, the extended discharge edge of the head. The articles to be painted are disposed opposite and in spaced relation to such discharge edge, and are electrically grounded. A high voltage is applied to the head, thus creating an electrostatic field between the articles and the paint on the discharge edge. The liquid coating material becomes, in effect, an electrode and one terminus of the field. Such field is strong enough at the discharge edge to effect electrostatic atomization, and the atomized paint particles, from the moment of their formation, bear maximum electrical charges which cause the particles to become dispersed and deposited on the articles. The atomization takes place at the point of highest field strength with the result that the particles bear maximum charges which provide a maximum electrical depositing force.

The systems eliminated the high-velocity air blast which was employed in the

Ransburg "No. 1 Process" to atomize and project the spray toward the articles, reduced paint losses to a few percent at most of the paint sprayed, and can be practiced in the open shop without the necessity for elaborate and expensive exhaust and overspray-recovery equipment.

13. The patents '536 and '417 in issue are directed respectively to the method and apparatus aspects of the first of three (3) successive and distinct steps which led to the several forms of the Ransburg "No. 2 Process" now in commercial use. The specific disclosures of those patents are the same and comprehend several different forms of atomizing heads, all characterized in that the head was so constructed that the paint or other coating material was supplied at a controlled rate to ooze from the interior of the head through a series of small openings and was supported at the discharge edge of the head in the form of a series of spaced, mechanically located droplets from each of which the paint was electrostatically atomized into a spray of finely divided particles. In the atomizer shown in Figures 5 and 6 of the patents, paint oozing through the small orifices in the head forms a continuous body supported on the sides of a series of contiguous needles projecting downwardly from the head. The paint on the sides of the needles is exposed and, at the lower tips of the needles is divided into droplets supported respectively on the spaced tips of the needles, which are close enough together to permit the paint to bridge the space between adjacent ones of the needle-tips locating the points at which the atomization occurs.

14. All claims of patent '536 are in issue and claims 4 and 10 having been selected by plaintiff as typical in accordance with rhetorical paragraph 8 of the complaint, 7(c) of the pre-trial conference order for December 5, 1963, and plaintiff's declaration in compliance with that pre-trial order filed August 4, 1964. These claims read on and are supported by the disclosure of the patent. No claim of the patent is, by its terms, limited to a method in which (1) the atomizing head is stationary, (2) the points at which atomization occurs lie in a straight line, (3) the points at which atomization occurs are located with respect to each other by structural features of the head, or (4) the electrostatic field is the sole agent contributing to atomization, dispersion, and deposition.

15. Patent '417 in issue is directed to the apparatus aspects of the first step referred to in finding thirteen (13). It resulted from a division of the application which matured into patent '536 referred to in finding four (4) and has the same disclosure. Only claims 3 and 4 of this patent are in issue and both having been designated by plaintiff as typical in accordance with rhetorical paragraph 8 of the complaint, 7(c) of the pre-trial conference order for December 5, 1963, and plaintiff's declaration in compliance with that pre-trial order filed August 4, 1964. Claims 3 and 4 (all claims in issue) of this patent read on and are supported by the disclosure of the patent. Those claims are directed to a coating apparatus embodying a head wherein, as exemplified by the head Figures 5 and 6, the coating material flows over an exposed surface and is so fed to the atomizing zone that it bridges adjacent points at which atomization takes place. No claim of the patent is, by its terms, limited to an apparatus in which (1) the atomizing head is stationary, (2) the points at which atomization occurs lie in a straight line, (3) the points at which atomization occurs are located with respect to each other by structural features of the head, or (4) the electrostatic field is the sole agent contributing to atomization, dispersion, and deposition.

16. The Crouse patent '893 in issue is directed to the method and apparatus aspects of the second of the three (3) steps referred to in finding thirteen (13) in the development of the forms of the Ransburg "No. 2 Process". Crouse, a Ransburg employee assigned to development work, discovered that it was not necessary, in order to obtain electrostatic atomization, that the coating material be mechanically formed into and atomized

from spaced mechanically located droplets. The specific heads shown and described in the patent are stationary. In each, the liquid is fed through an annular, rectilinear, or arcuate slot to form it into a film of substantially uniform thickness flowing to a smooth discharge edge of the head, and the field itself deforms the film-edge into a series of spaced cusps or streams from the tips of which electrostatic atomization of paint occurs. By deforming the film-edge and thus locating the atomizing sites electrostatically rather than mechanically, as in the specific heads of the Starkey et al patents, this patent's '893 simplified head construction, reduced the likelihood of clogging, and made practicable a closer spacing of the atomizing sites and a consequent increase in the atomizing capacity of a head of given size. The round atomizing heads in this patent '893 have the further advantage of avoiding the electrical "end effect" which concentrates field strength at the ends of a straight-edged head and thus interferes with maintenance of a substantially uniform field strength along the exposed film throughout the entire extent of the atomizing zone.

17. Claims 1–3, 5–7, 9 and 10 of patent '893 are in issue and claims 2 and 9 have been selected by plaintiff as typical in accordance with rhetorical paragraph 8 of the complaint, 7(c) of the pre-trial conference order for December 5, 1963, and plaintiff's declaration in compliance with that pre-trial order filed August 4, 1964. These claims read on and are supported by the disclosure of the patent. No claim of the patent is, by its terms, limited to a method and apparatus in which (1) the atomizing head is stationary, (2) to a head in which the film is formed by passing the coating material through an elongated slot, or (3) to a head in which the electrostatic field is the sole agent contributing to atomization.

18. The patent '894 in issue is directed to the method and apparatus aspects of the third of the three (3) steps referred to in finding thirteen (13) in the development of the forms of the Ransburg "No. 2 Process". This patent '894 is directed primarily to an improved method and apparatus for forming the film contemplated by patent '893 in issue in this case. This additional development made possible the form of the Ransburg "No. 2 Process" which has the widest use and acceptance in the market. The patent '894 disclosed several forms of a charged generally cup-like atomizing head which was rotated about its axis. Liquid coating material supplied to the interior of such a head is subjected to the action of centrifugal force and is thereby caused to form a film on the inner surface of head and flow to the rim of the head, where it is formed into cusps and atomized. The rotating heads of Ransburg provided several advantages over the non-rotating heads of the patent '893. They insured a circumferentially uniform distribution of spray particles within the projected spray and the deposited spray pattern; they effectively overcame any effect gravity might have in concentrating paint at the low point of a discharge edge not disposed accurately in a horizontal plane; they made it possible to eliminate the long, narrow film-forming slot present in specific heads disclosed by the patent '893; and they made it possible to control the thickness of the liquid film all the way to the discharge edge of the head.

19. Claims 1–8 of patent '894 are in issue and claims 1 and 7 have been selected by plaintiff as typical in accordance with rhetorical paragraph 8 of the complaint, 7(c) of the pre-trial conference order for December 5, 1963, and plaintiff's declaration in compliance with that pre-trial order filed August 4, 1964. These claims read on and are supported by the disclosures of the patent. No claim of the patent is, by its terms, limited to a method and apparatus in which (1) to any particular form of head, or (2) to a system in which the electrostatic field is the sole agent contributing to atomization. Claim 6 of this patent (but none of the other claims are involved as claim 6) places a maximum limit on the

rotational speed of the head, and it merely requires that the rotational speed be insufficient in itself to produce atomization comparable to that produced where the electrostatic field exists.

20. The respective methods of the three (3) patents '536, '893, and '894 in issue occupy the relation of genus; sub-genus; and species.

21. Most of the claims in suit require the step of, or means for, feeding the liquid coating material to the head or the atomizing zone at a controlled or regulated rate. The rate so specified is one corresponding to that at which the material is atomized into finely divided particles.

22. The applications which resulted in the patents in suit had extended prosecution and careful consideration at the hands of the Examiners and Board of Appeals of the Patent Office. Among matters considered by the Patent Office before granting the patents in suit were several of the grounds here advanced by the defendant in support of its allegations that those patents are invalid.

23. The subject matter described in all of the claims of patent '536 and in claims 3 and 4 of patent '417 was conceived by the patentees of those patents at least as early as late October or early November, 1943. Devices embodying such subject matter were constructed and operated, and the patent application Serial No. 556,390 thereon was filed, with the exercise of reasonable diligence, and the effective date of invention for such subject matter is no later than late in October or early in November, 1943. The application on which patent '417 issued was filed during the pendency of application Serial No. 556,390, filed September 29, 1944. Claims 3 and 4 of patent '417 read on the disclosure and subject matter of application Serial No. 556,390 and are entitled to an effective filing date of September 29, 1944.

24. The application on which patent '893 issued was filed during the pendency of application Serial No. 13,174, filed March 5, 1948. All of the claims of the patent '893 read on the disclosure and subject matter of the application Serial No. 13,174 and are entitled to an effective filing date of March 5, 1948.

25. The application on which patent '894 issued was filed during the pendency of application Serial No. 143,994 and the latter application was filed during the pendency of application Serial No. 57,259, filed October 29, 1948. All of the claims of patent '894 read on the disclosure and subject matter of both applications Serial Nos. 57,259 and 143,994 and are entitled to an effective filing date of October 29, 1948.

26. A spray-painting operation requires that the paint be atomized at an adequate rate and that the provided liquid material be transferred from the source to the surface of the article to be coated in a form capable of flowing out into an acceptable finish. The material must be formed into a spray of suitable shape and size and the spray particles must be small enough to avoid creating an objectionably rough finish and large enough that their volatile constituents will not evaporate to such an extent that the deposited particles are too dry. Production of the better quality finishes demanded by industry requires that the larger spray particles of the spray form, on deposition, spots no larger than about 0.015 inch in diameter. The methods described in the process claims in suit meet those practical requirements and have been widely used in industry to paint a variety of types of articles including automobile parts, light fixtures, furniture frames, and cabinets for domestic refrigerators and laundry appliances. In all such forms of commercial uses, paint was fed to the discharge edge of the head in the form of a uniform film, in accordance with the disclosure of patent '893, and in all but one form of such uses in this country the film was formed and fed by centrifugal force generated by rotating the head. Approximately one hundred (100) installations in foreign countries use non-rotating atomizers of the type disclosed and claimed in the patent '893.

27. The subject matter defined and taught by the claims of each of the four (4) Ransburg patents in issue has filled a long felt want in industry and the methods and apparatus embodying such subject matter have found wide use in industry. Plaintiff has issued over a thousand (1000) licenses to companies for ultimate manufacturing use of such subject matter. Some of the licensees are of the largest industries in this country. The plaintiff has substantial investments and personnel in the business. Such licensees have paid the plaintiff substantial fees for the right to use such subject matter. This has resulted in substantial health benefits to employees of the manufacturer, production costs savings to the manufacturer and the ultimate money savings to the consumer of the manufactured product.

28. The success enjoyed by the systems covered by the four (4) Ransburg patents in issue is attributable to paint savings, savings in equipment, health of employees of users and reduction in costs of manufacture and reduction of capital investment. While all the specific atomizers used in plaintiff's commercial spray coating systems differ in detail from the specific atomizers shown in patents '536 and '417, the commercial systems all embody the fundamental concepts to which the claims in suit of these two (2) patents are directed, and the commercial success the systems have enjoyed is to be credited basically to the inventions those claims describe.

29. All of plaintiff's commercial uses of the subject matter covered by the Ransburg patents '536 and '417 have employed the subject matter defined in the claims of the Ransburg patent '893 and all but one (1) form of such uses in the United States of America have employed the subject matter defined in all four (4) of the Ransburg patents in issue. The stationary electrostatic atomizing heads having straight edges like those portrayed in Figures 6 and 7 of Ransburg patent '893 have had substantial licensed use in various European countries.

30. The disclosures of the four (4) Ransburg patents in issue all and each contain adequate descriptions of the separate inventions to enable a person of ordinary skill in the art of spray painting, electrostatic spray painting, to practice the several inventions.

31. The claims of each of the four (4) Ransburg patents in issue are amply supported by the respective specifications of each of the respective patents. They are neither vague, indefinite, ambiguous, deceptive, nor misleading in character, and are not broader than the disclosures of the respective applications as originally filed in the United States Patent Office.

32. The first inventions of the subject matter set forth in the claims of each of the four (4) Ransburg patents in issue are as follows:

patents '536 and '417 were invented by W. A. Starkey and E. M. Ransburg;

patent '893 was invented by W. W. Crouse; and

patent '894 was invented by E. M. Ransburg.

33. The subject matter defined in each of the claims of each of the respective four (4) Ransburg patents in issue was not in public use or on sale in the United States of America more than one (1) year prior to the effective filing date of the respective patent containing the respective claim.

34. The defendant's amended answer alleges that the subject matter of each of the claims of the four (4) Ransburg patents in issue had been shown described and patented or published before the invention thereof by plaintiff's assignors, or more than one (1) year prior to the first disclosure thereof in the respective applications for the four (4) Ransburg patents in issue.

Specifically the answer alleges and refers to the following alleged prior art as to Ransburg patent '536, and particularly claims 1 to 11, inclusive, thereof; Ransburg patent '417, and particularly claims 3 and 4 thereof; Ransburg patent

'893, and particularly claims 9, 2, 3, 5, 6, 7, 9 and 10 thereof; and Ransburg patent '894, and particularly claims 1, 2, 3, 4, 5, 6, 7 and 8 thereof:

(A) PURPORTED ART CITED AGAINST ALL FOUR (4) RANSBURG PATENTS

| Patentee | Patent Number | Date Issuance |
|---|---|---|
| Rieber | U.S. 1,330,218 | February 10, 1920 |
| Schmidt | U.S. 1,604,424 | October 26, 1926 |
| Carlstedt | U.S. 1,627,686 | May 10, 1927 |
| Fawkes | U.S. 1,908,230 | May 9, 1933 |
| Wintermute | U.S. 1,959,752 | May 22, 1934 |
| Ransburg et al | U.S. 2,247,963 | July 1, 1941 |
| Morse | U.S. 2,257,807 | October 7, 1941 |
| Ransburg | U.S. 2,270,341 | January 20, 1942 |
| Plateau | French 715,561 | 1931 |

Publications

Article by John Zeleny entitled "Instability of Electrified Liquid Surfaces" at pages 1–6, inclusive of The Physical Review, Volume X, Series 11, July, 1917.

Article entitled "The Principles of Spray Dryer Design and Operation" on pages 439–441 in The Industrial Chemist, November, 1934, and the continuation thereof.

(B) PURPORTED ART CITED AGAINST RANSBURG PATENTS '536 AND '417

| Patentee | Patent Number | Date Issuance |
|---|---|---|
| Waite | U.S. 672,047 | April 16, 1901 |
| Kitsee | U.S. 792,052 | June 13, 1905 |
| Cross | U.S. 2,281,558 | May 5, 1942 |
| Thomson | Britain 2,147 | 1867 |

Publications

The Life of William Thomson, Volume 1, MacMillan & Co., Ltd., 1910.
Lord Kelvin by Andrew Gray, 1908.

(C) PURPORTED ART CITED AGAINST RANSBURG PATENTS '893 AND '894

| Patentee | Patent Number | Date Issuance |
|---|---|---|
| Ransburg | U.S. 2,334,648 | November 16, 1943 |
| Darrah | U.S. 2,362,889 | November 14, 1944 |
| Crisp | U.S. 2,369,216 | February 13, 1945 |

Publications

Article entitled "Finishing Without Tears" on pages 17, 18 and 19 of the May 1944 issue of "Electrified Industries".

———◆———

35. The art relied on by the defendant in the pleadings and in evidence does not contain anything constituting a complete anticipation of any of the claims in

suit. Every apparatus or method of such art lacks one or more of the features required by each such claim.

Such art fails to suggest to one skilled in the art any use of old apparatus to practice the coating methods claimed or to suggest that individually old method steps and apparatus features could be combined to produce a practicably usable electrostatic paint spraying system wherein (a) liquid coating material is atomized without the use of air from a supported liquid body constituting an electrode from which a field extends to the articles to be coated, (b) the field at the liquid electrode is of atomizing strength, (c) the atomized particles are effectively charged at the time of their formation, (d) the field disperses the charged liquid particles and deposits them electrostatically on the articles, and (e) the supported liquid body is replenished at a rate corresponding to the rate of atomization.

Such art is not any more pertinent to the validity of the four (4) Ransburg patents in issue than was the prior art considered by the United States Patent Office before issuing the patents in issue in this case.

Such art does not disclose a spray coating system including an elongated edge member from which charged liquid coating material is atomized at a plurality of atomizing sites so closely spaced as to form a substantially continuous atomizing zone as taught by, and contemplated in the claims of the patents in issue.

Such art does not disclose an electrostatic spray coating process in which liquid coating material is advanced in a thin film to the edge of an atomizing head, an electrical potential is created at such edge by applying voltage to such atomizing head, with the electrical potential being sufficient to create an electrostatic field between such atomizing head and the objects to be coated of sufficient strength to disperse and deposit the liquid coating material on articles to be coated and atomizing liquid coating material at the point of highest concentration of the lines of force in the electrostatic field.

While certain individual steps or elements of the Ransburg patents in issue and of plaintiff's commercial device may be found in such art none of such art discloses the combination of elements or steps utilized by plaintiff in its apparatus for electrostatic spray coating of articles. Such prior art likewise does not disclose the accused systems of defendant which employ the three (3) accused types of heads.

36. The defendant's evidence and demonstration in trial, including model exhibits, came after defendant's research personnel were thoroughly indoctrinated in the teachings of the four (4) Ransburg patents in issue and on-site inspection of plaintiff's licensee operations of plaintiff's devices. Defendant's demonstrative and oral evidence of asserted prior art departed from the teachings of the prior art in structure and in operation in one or more respects. The results of tests of such prior art in evidence discloses them not to be the intended results of normal and intended operation of devices actually disclosed in such art. The features and subject matter of the four (4) Ransburg patents in issue are not expressly taught by such prior art nor are such inherently present in such prior art. A review of my findings of specific purported prior art follows:

THE PRIOR ART OF PATENTEE KITSEE (U. S. PATENT 792,052 OF JUNE 13, 1905); OF PATENTEE THOMSON (BRITISH PATENT 2,147 OF THE YEAR 1867); AND THE TWO (2) CITED BIOGRAPHIES OF THOMSON (THE LIFE OF WILLIAM THOMSON AND LORD KELVIN) ASSERTED AGAINST RANSBURG PATENTS '536 AND '417 IN ISSUE.

The Thomson recording telegraph device described in the British patent of the year 1867 and in the two (2) cited biographies embodied a capillary tube which discharge ink onto a moving paper tape

from a tip located closely adjacent to the face of the tape. Suitable mechanism moved the tube-tip laterally of the tape in response to incoming electric signals, with the result that the discharged ink produced on the tape a line containing waves corresponding to the dots and dashes of the received signal.

The Thomson patent refers to the ink being transferred by means of a spark, a means wholly foreign to the Ransburg patents coating inventions and unusable in painting operations where flammable materials are present.

The references do not teach that the ink is atomized and the disclosed gap between the tube-tip and the tape is too small to permit dispersion of particles even if atomization could have occurred. The patent drawing discloses the capillary tube to be so close to the tape that there appears to be contact between the tube and tape. Dispersion would defeat the purpose of Thomson to obtain a fine line. (In the latter respects, these references, which are relied on only against the Ransburg patents '536 and '417 in issue, resemble Huebner patents 2,224,-391 and 2,451,288 which disclosed the electrostatic transfer of ink across narrow gaps and which were cited by the United States Patent Office in the proceedings leading to the grant of Ransburg patents '536 and '417 in issue.)

Defendant's operation of the Thomson model did not conform to the teachings of the telegraph recorder shown in the Thomson patent nor in the cited biographies. The tube was spaced a substantial distance from the tape thereby creating a broad line through dispersion of ink thus violating the patent and the related biographies.

The device of a recording telegraph taught by the patentee Kitsee (U. S. patent 792,052 of the year 1905) was cited in defendant's amended answer referred to in finding thirty-four (34) was not asserted or exhibited in the evidence in this trial.

This art does and could not teach practicable spray coating devices. Any delivery of liquids from such capillary device would be at such a low rate as to make it inoperable as a coating device.

THE PRIOR ART OF PATENTEE WAITE (U. S. PATENT 672,047 OF APRIL 16, 1901; ARTICLE BY POTTS; WAITE AND BARTLETT CATALOGUE; AND THE 1900 ARTICLE ON PAGE 103 OF "MEDICAL TIMES" ASSERTED AGAINST RANSBURG PATENTS '536 AND '417 IN ISSUE.

The Waite device described in the U. S. patent of the year 1905 and publications in evidence pertaining thereto contemplates the treatment of disease or promotion of health by the application of electrical charges to the human body. The means disclosed by this art for that purpose was a pointed "electrode" provided with an open saucer-like reservoir communicating with a horizontal passage through which a liquid medicant could be supplied to the tip of the electrode, there to be discharged "in the form of an exceedingly light and penetrating vapor" which vapor, "diffuse(s) about the patient" and "penetrates the clothing". This art only teaches that the medicine reaches the patient in a gaseous form. This art does not disclose means for, or the step of, controlling the rate of liquid feed, nor does it disclose the production of charged liquid particles or the electrostatic deposition of liquid particles.

The 1900 article on page 103 of "The Medical Times" refers to the reading of a paper by Doctor Harry F. Waite. It reports his description of an experiment in which he filled with paint a hollow, pointed metal piece having a hole through the point, connected the piece to an influence machine (developer of an electric charge) and was able to spray the paint whenever he desired. The article contains no disclosure or suggestion that the paint was fed at a controlled rate to the point, that the spray was in a form that could properly be called atomized, that any article was coated with the spray, or that any electrostatic field extended to any article or object on which the spray happened to fall. Since electrostatic

break-up of paint on a charged electrode can occur in the absence of an object to receive the paint, the article is even less pertinent than the Graveley patent 2,359,476 which was considered by the United States Patent Office against the application that resulted in the granted Ransburg patents '536 and '417 in issue.

The Waite art fails to disclose or suggest any method or apparatus in which (a) a liquid coating is applied to an article to be coated, (b) liquid is fed at a controlled rate to a site of break-up or vaporization, or (c) electrically charged liquid particles are deposited on an article by a field extending from such article to the site of break-up or vaporization.

Demonstrations in evidence of this art were inaccurate as not complying with the teachings of the art. The capillary passage had been enlarged to increase delivery of liquid. No workable coating device did or could result from the true Waite device or the inaccurate model.

This art does not and could not teach practicable spray coating devices. Any delivery of liquid from such capillary device would be at such a low rate as to make it inoperable as a coating device.

THE PRIOR ART OF THE ARTICLE BY JOHN ZELENY ENTITLED "INSTABILITY OF ELECTRIFIED LIQUID SURFACES" PUBLISHED IN THE YEAR 1917 ASSERTED AGAINST ALL FOUR (4) OF THE RANSBURG PATENTS IN ISSUE.

Mr. Zeleny described in this article scientific or laboratory tests of no suggested utility. They were conducted for the purpose of studying instabilities occurring when a liquid such as glycerine, water or alcohol seeping from a capillary tube or orifice is electrified. He reported that under certain conditions a liquid would be broken-up into drops. This cited art does not disclose or suggest the coating of an article or a practicable, usable spray painting system.

This art does not and could not teach practicable spray coating devices. Any

delivery of liquids from such capillary device would be at such a low rate as to make it inoperable as a coating device.

THE PRIOR ART OF PATENTEES RIEBER (U. S. PATENT 1,330,218) OF THE YEAR 1920; FAWKES (U. S. PATENT 1,908,230) OF THE YEAR 1933; MORSE (U. S. PATENT 2,257,807) OF THE YEAR 1941; CRISP (U. S. PATENT 2,369,216) OF THE YEAR 1945; PLATEAU (FRENCH PATENT 715,561) OF THE YEAR 1931; AND OF THE ARTICLE ENTITLED "THE PRINCIPLES OF SPRAY DRYER DESIGN AND OPERATION" PUBLISHED IN THE YEAR 1934 WHICH ARE ALL ASSERTED AGAINST ALL FOUR (4) OF THE RANSBURG PATENTS IN ISSUE EXCEPT THE ART OF THE PATENTEE CRISP WHICH IS ASSERTED ONLY AGAINST THE RANSBURG PATENTS '893 AND '894 IN ISSUE.

This cited art all disclose centrifugal atomizers. The art does not apply any electrical potential to the atomizer or use of electrostatic forces in any way in atomizing or depositing paint or other liquid. The art may disclose the formation of a film on a rotating atomizer just as did the Hopkins U. S. Patent 1,861,475 which was considered by the United States Patent Office in the prosecution of both of the applications that resulted in the granted Ransburg patents '893 and '894 in issue.

While atomizers employing uncharged rotating members have been known for many years, they have been little used in coating systems. However, when the rotating member is charged to create a field extending from it to the article being coated, the result is a system which has enjoyed wide commercial use. Such disparity in the extent of use of these devices in such coating systems evidences unique and unexpected results from an electrostatic coating system employing a charged rotating atomizer.

THE PRIOR ART OF PATENTEE RANSBURG (U. S. PATENT 2,-247,963) OF THE YEAR 1941, (U. S. PATENT 2,270,341) OF THE YEAR 1942, (U. S. PATENT 2,-334,648) OF THE YEAR 1943, AND OF THE PATENTEE CROSS (U. S. PATENT 2,281,558) OF THE YEAR 1942 WHICH ARE ASSERTED AGAINST ALL FOUR (4) OF THE RANSBURG PATENTS IN ISSUE EXCEPT THAT THE ART OF PATENTEE CROSS IS ASSERTED AGAINST RANSBURG PATENTS '536 and '417 IN ISSUE AND EXCEPT THAT THE ART OF PATENTEE RANSBURG (U.S. PATENT 2,334,648) IS ASSERTED AGAINST RANSBURG PATENTS '893 AND '894 IN ISSUE.

The subject of this cited art is the mechanical atomizer which forms and projects a spray of atomized liquid particles into an electrostatic depositing field. This art is essentially the same class of art as the Ransburg "No. 1 Process". Every arrangement they disclose for providing electrical charges on the particles sprayed, the particles do not receive any intended significant charge until after being formed. Any significant charge on the spray particles is acquired by ion bombardment in the field. Atmospheric ions of one (1) polarity are created immediately adjacent the fine-wire discharge or precipitating electrode, are repelled therefrom toward the grounded articles and occupy the field. Colliding with the coating-material particles mechanically projected into the field, the ions transfer their charges to the particles. The increasing charge thus imported to each spray particle repels approaching similarly charged atmospheric ions with ever increasing effect with the result that, in any particular set of circumstances, there is a top charge which any spray particle can acquire, and many of the particles do not acquire that top charge.

In the basic process to which the patents in suit are directed, the unatomized paint is an electrode at the point of highest field strength and the fine spray particles leaving the cusp tips are formed at that point. As a result each spray particle, from the instant of its formation, bears the maximum possible charge, substantially higher than that which can be imported by ion bombardment. The magnitude of the charge determines its response to the electrical forces of the field and, therefore, the electrostatic depositing effect in the system of the patents in suit is greater than that in systems relying on ion bombardment to effect charging of the particles.

The reference in the art of Ransburg patent 2,270,341 to the possibility of replacing its compressed-air spray guns with "a well known type of centrifugal spray device" in no way suggests a system like that of the patents in suit. In such an arrangement, the atomizer would be positioned outside the coating chambers and would not be charged. The liquid particles projected by ion bombardment with ions emanating from the charged, fine-wire grid occupying the spray-passing opening in the side wall of the booth. In the patent 2,270,341, there is no field taught as existing between the atomizer, regardless of type, and the articles to be coated, as distinguished from the inventions in suit relating to the "No. 2 Process". Replacement of the illustrated spray guns with centrifugal atomizers would not affect the manner in which the particles are charged. Patent 2,270,341 does not teach that the "centrifugal spray device" would possess any electrostatic atomizing effect, and no such effect would in fact exist. With knowledge gained from the teachings of the Ransburg patents in issue, the personnel of the defendant made substantial and material alterations in this art and in merging purported construction of the several prior art patents which alterations and the merger thereof were contrary to the teachings of the respective prior art patents and are obviously the

creature of retrospective awareness of the teachings of the patents in issue.

PRIOR ART OF THE PATENTEE WINTERMUTE (U. S. PATENT 1,959,752) OF THE YEAR 1934 ASSERTED AGAINST ALL FOUR (4) RANSBURG PATENTS IN ISSUE.

This art discloses nothing in respect to spray coating but relates rather to improvements on an old form of gas cleaner of a type in which a stream of gas containing suspended particles is passed through electrostatic fields maintained between fine vertical wire discharge electrodes and collecting electrodes of large area, the suspended particles becoming charged and depositing on the collecting electrodes.

The art is specifically concerned with the removal of accumulated dust and the like from the electrodes of an electrostatic gas cleaner. In it a jet of water supplied under high pressure to the upper end of each wire discharge electrode, is projected downwardly over the electrode surface as a spray to flush and remove solid material accumulated thereon, and is said to be "thrown off" the wire by "electrical forces".

The art is concerned with decoating rather than coating which is the concern of the patents in issue. The art does not disclose that electrical forces can break-up coating material such as paints or like residue-leaving liquids. The construction disclosed in this art would not provide a thin, continuous liquid film, a controlled rate of feed to the sites of liquid break-up, or a substantially continuous atomizing zone. The apparatus disclosed by Wintermute would not be practicable or usable as a paint spraying system.

Defendant's personnel with present knowledge of the teachings of the Ransburg patents in issue have attempted to adapt this art to the coating art. Such adaptations did not comply with the patentee's art. They excluded the gas stream, reduced the flow rate of water down the discharge electrode to one-tenth (1/10) of the minimum taught by the art, in an unsuccessful effort to create the thin film taught by Ransburg patents in issue and which concept is contrary to the teachings of this prior art. This prior art actually teaches that the discharge electrode to be washed by a high velocity jet of water constituting a spray rather than a film. The unwarranted adaptation is incapable of the controlled rate of flow to the sites of atomization, as taught by plaintiff's patents in suit, since each site of atomization is of necessity overfed in order to provide sufficient material for all the succeeding sites of atomization. As a result of the over-feeding, the atomization was unstable resulting in large globs of liquid being thrown from the wire. This art does not teach the use of paint or other finish coating materials and in fact is contrary to the teachings of removing or flushing away of material deposited on the electrodes.

THE PRIOR ART OF THE PATENTEE DARRAH (U. S. PATENT 2,362,889) OF THE YEAR 1944 ASSERTED AGAINST RANSBURG PATENTS '893 AND '894 IN ISSUE.

This art discloses an apparatus and method for practicing fractional distillation. In distillation, a composite liquid containing portions or "fractions" of different volatility is heated to evaporate its more volatile fraction or fractions into gaseous form, and the gaseous distillation is moved to a surface at low temperature where it is cooled and condensed into liquid form, and the condensed distillate is collected. This is opposite to the principle of the coating art. In coating, the composite liquid material is always moved from the source to and deposited on the target as a liquid and never as a gas. The contrasting character of the techniques in distillation and coating evidences one would never be associated with the other. This art discloses that a lower boiling point fraction of liquid flowing over a heated electrode is vaporized by heat, leaves the liquid as

a gas, and, while in gaseous form is electrostatically transported to an oppositely charged, cooled electrode. Unvolatilized fractions of the mother liquid run from the hot electrode and are collected, while the gaseous distillate condenses to liquid form on the cooled electrode, runs therefrom, and is separately collected.

This art does not teach that electrostatic atomization takes place, or that liquid particles are transported and deposited by electrostatic forces. Any such atomization and deposition would defeat the patentee's purpose in this art, for it would dilute the low boiling point distillate with high boiling point fractions intended to remain behind as a liquid on the hot electrode. The art does not rely upon stratification of the liquid film into layers of the volatile and unvolatile liquids on the hot electrode, as interpreted by defendant's personnel, in fact, such stratification would be contrary to known laws of nature. The art does not teach that atomization occurred from the liquid on the heated electrode. This art does not disclose a practicably usable paint spraying method or apparatus.

If the teaching of this art were followed in the coating art, all of the paint resins would be left at the source and would not be transferred to the collecting electrode. Only the solvent of the coating material would be transferred. Furthermore, the use of heat or change of temperature is contrary to the principles of practical coating.

This art is unadaptable to the coating art without the use of the teachings of the Ransburg patents in issue. It is incapable of producing a practicable spray painting device even with unwarranted alterations not taught by the asserted art. The flow of liquid was not the controlled rate of flow to the sites of atomization taught by the Ransburg patents in issue as each of the sites must be over-fed in order to provide sufficient material for all succeeding sites of atomization. The over-feeding makes the atomization unstable resulting in large particles or globs of liquid being thrown from the electrode.

THE PRIOR ART OF THE PATENTEE SCHMIDT (U. S. PATENT 1,604,424) OF THE YEAR 1926 ASSERTED AGAINST THE FOUR (4) RANSBURG PATENTS IN ISSUE.

This art relates to distillation methods and apparatus (like the cited prior art of the patentee Darrah U. S. Patent 2,362,889). In this art, the liquid (specifically petroleum) to be fractioned is sprayed into a stream of hot gas, which must be at least six hundred (600) degrees fahrenheit to volatilize "all or a considerable portion" of the sprayed particles. Both the volatilized fractions and liquid particles containing the unvolatilized fractions are conveyed in the gas stream out of the vaporizing chamber and into an electrostatic gas cleaner or precipitator chamber in which the liquid particles are charged and precipitated out of the gas stream and continuously drawn off, while the gas stream continues on to carry the still gaseous fractions through progressive condensation steps. One (1) of the means for spraying the oil into the hot gas stream is a charged, rotating atomizer.

This art does not teach coating methods and apparatus in which liquid particles are deposited as a finished coating on an article; in fact the liquid drains from the bottom of the chamber. Electrostatic deposition of liquid on the walls of the interior of the chamber in this art is not inevitable in the application of the teachings of this art. This art does not disclose formation or electrostatic spacing of cusps at the atomizer edge, electrostatic deposition by the same field, or any practicable, usable paint-spraying method and apparatus. Defendant's evidence of adaptation of this art with knowledge of the teachings of the Ransburg patents in issue did not comply with this art's teachings. It failed to include a carrying gas stream and no means were provided for heating the liquid material or the

carrying gas stream contrary to this cited art's teachings. If these elements were used, they would inhibit, if not prevent, the possibility of any material being deposited on the interior chamber wall, thus defeating the object of the coating art and the Ransburg patents in issue.

## THE PRIOR ART OF THE ARTICLE ENTITLED "FINISHING WITHOUT TEARS" OF THE YEAR 1944 ASSERTED AGAINST RANSBURG PATENTS '893 AND '894 IN ISSUE.

This art discloses the Ransburg "No. 1 Process" and the application of the electrostatic detearing process in which excess paint is removed from an article which has been dipped or flow-coated. For its showing of the Ransburg "No. 1 Process", the article is no more pertinent than the patents (Ransburg 2,247,963 of the year 1941; Ransburg 2,270,341 of the year 1942; Ransburg 2,334,648 of the year 1943; Cross 2,281,558 of the year 1942) referred to on page 24 of this finding 36. For its showing of detearing or "decoating", the article is no more pertinent than that of the Graveley U. S. Patent 2,359,476 cited and referenced by the United States Patent Office in the prosecution of application and in granting of the Ransburg patent '536. The article does not disclose or suggest positively deforming liquid coating material into a film, forming a film from liquid coating material delivered at a controlled rate or atomizing from an annular atomizing zone or from a rotating head.

37. The defendant's amended answer alleges that the subject matter of each of the claims of the four (4) Ransburg patents in issue had been known to and/or invented and reduced to practice in the United States of America prior to the Ransburg inventions and more than one (1) year prior to any effective filing date of the applications for such patents or disclosed by Ransburg or its assignors. Specifically the answer alleges and refers to the following persons or concerns:

## (A) PURPORTED PRIOR USERS OF SUBJECT MATTER OF ALL FOUR (4) RANSBURG PATENTS IN ISSUE.

William H. Bennett and Robert B. Taylor of and at Newark, Ohio, as well as elsewhere in the United States, said Bennett and Taylor being the patentees of patent No. 2,491,889, granted December 20, 1949 on an application filed January 21, 1942, and also being the applicants of application Serial No. 427,638 filed January 21, 1942 and also included by reference in such patent No. 2,491,889.

## (B) PURPORTED PRIOR USERS OF SUBJECT MATTER OF RANSBURG PATENTS '536 AND '417 IN ISSUE.

William Austin Darrah of and at Chicago, Illinois, as well as elsewhere in the United States of America, said Darrah being the patentee of patent No. 2,362,-889, granted November 14, 1944 on an application filed February 5, 1942.

George B. Crisp of and at Brooklyn, New York, as well as elsewhere in the United States of America, said Crisp being the patentee of patent No. 2,369,216, granted February 13, 1945 on an application filed May 27, 1942.

Ford C. Pethick of and at Englewood, New Jersey, and New York, New York, as well as elsewhere in the United States of America, said Pethick being the patentee of patent No. 2,633,796, granted April 7, 1953 on an application filed April 5, 1944.

## (C) PURPORTED PRIOR USERS OF SUBJECT MATTER OF RANSBURG PATENTS '893 AND '894 IN ISSUE.

William A. Starkey of Zionsville, Indiana, Edwin M. Ransburg of Indianapolis, Indiana, and Ransburg Electro-Coating Corporation of Indianapolis, Indiana, at Indianapolis, Indiana, and elsewhere in the United States of America, said Starkey and said Edwin M. Ransburg being the patentees of patents Nos. 2,685,536 and 2,794,417, granted August 3, 1954 and June 4, 1957, respectively, and filed September 29, 1944.

Thomas J. Arbron of and at Romeo and Capac, Michigan, said Arbron being the patentee of patent No. 2,456,853, granted December 21, 1948 on an application filed June 19, 1946.

## (D) PURPORTED PRIOR USERS OF SUBJECT MATTER OF RANS-BURG PATENT '894 IN ISSUE.

William E. Crouse of Carmel, Indiana, and Ransburg Electro-Coating Corporation of Indianapolis, Indiana, at Indianapolis, Indiana, and elsewhere in the United States of America, who was the patentee of patent No. 2,893,893 granted January 31, 1950 and alleged to be a continuation in part of a prior application Serial No. 13,174 filed March 5, 1948.

38. The defendant's evidence and demonstrations in trial, including model exhibits, came after defendant's research personnel were thoroughly indoctrinated in the teachings of the four (4) Ransburg patents in issue and onsite inspection of plaintiff's licensee operations of plaintiff's devices. Defendant's demonstrative and oral evidence of that art asserted to have been known to and/or invented and reduced to practice by others than the plaintiff or its assignors departs from the teachings of such art in structure and in operation in one or more respects. The results of tests of such prior art in evidence discloses them not to be the intended results of normal and intended operation of devices actually disclosed in such art. The features and subject matter of the four (4) Ransburg patents in issue are not expressly taught by such art nor are such inherently present in such prior art. The four (4) Ransburg patents in issue had not been known to and/or invented and reduced to practice before plaintiff and its assignors by others as claimed by defendant's answer. A review of my findings of alleged prior art and users follows:

## THE DEFENDANT'S CLAIM OF PRIOR KNOWLEDGE, INVENTION, PRACTICE AND USE OF ALL FOUR (4) OF THE RANSBURG PATENTS IN ISSUE BY WILLIAM H. BENNETT AND ROBERT B. TAYLOR OF AND AT NEWARK, OHIO, AS WELL AS ELSEWHERE IN THE UNITED STATES, WHO ARE THE PATENTEES OF U.S. PATENT NO. 2,491,889, GRANTED DECEMBER 20, 1949 ON AN APPLICATION FILED JANUARY 21, 1942, AND ALSO WHO WERE THE APPLICANTS OF APPLICATION SERIAL NO. 427,638 FILED JANUARY 21, 1942 WHICH WAS REFERENCED IN THEIR PATENT.

The Bennett et al. patent discloses a compressed-air spray gun, generally of conventional type, modified by the presence of a pointed needle projecting forwardly from the liquid orifice of the gun and electrically charged, with the gun, to a polarity opposite that of the objects to be coated. The spray is formed as in the conventional compressed-air spray gun, and the spray particles are then charged by ion bombardment, essentially as in the old Ransburg "No. 1 Process". If, as stated in the patent, charges acquired by the spray particles should assist in breaking them up, such break-up is not the atomization contemplated by the claims in suit. The latter atomization is not a breaking-up of particles in space, but instead is the formation of particles at the point of highest field strength from a supported, charged body of liquid which is continuously being replenished and maintained at a controlled rate. In the Bennett et al patent a significant electrostatic field exists between the gun and a plate-like electrode which extends along one(1) side of the path the spray must follow to reach the objects being coated, and the electrostatic forces of that field deposit substantial quantities of spray particles on the plate electrode even when the gun is oriented to discharge parallel to the plate. The character of the atomization produced by the Bennett et al. patent gun is not affected by the charge of the gun and needle as shown by the evidence.

While some liquid may impinge on the charged needle during the normal air operation of the Bennett et al. patent gun

and may be expelled therefrom by the charge, such impingement is happenstance. The liquid, if it impinges on the needle at all, does not form a film fed at a controlled rate as taught by the plaintiff's four (4) patents in issue and should the liquid be thrown from the needle it constitutes a detriment to the air spray operation. As evidence by the failures of those associated with Bennett et al. patent gun to produce a practical system of airless electrostatic atomization, the presence of liquid on the needle during air operation failed to teach those skilled in the art how such is to be accomplished. Although in 1942, the Bennett et al. patent gun was made fully known as an air atomizing gun to the DeVilbiss Company, the largest spray gun manufacturer in the United States, no one was motivated and taught how to construct an airless electrostatic coating system by this gun. The gun was first marketed in 1964 some twenty-two (22) years after it was made known to DeVilbiss and after plaintiff's air electrostatic spray gun was commercially marketed.

The Bennett application Serial No. 427,638 was abandoned by the applicants. It shows a gun similar to that of the Bennett et al. patent gun and is relied on by defendant in this case for the statement that the electrical charge under certain conditions, "may be relied upon as the sole means for breaking the fluid into fine particles". The abandoned Bennett application fails to disclose the "certain conditions" under which the electrical charge could be utilized as the atomizing force. The abandoned application fails to advance beyond the purely scientific phenomenon of electrostatic break-up of liquids.

William H. Otto, a graduate student, conducted the tests under the direction of Mr. Bennett on the air gun shown in the Bennett et al. patent and application. While conducting several experiments, the air was turned off while the gun was charged. The break-up of the liquid by the charge alone resulted in many particles so large they fell to the floor without ever striking the target and was so poor as compared with atomization produced by compressed-air, that such approach was abandoned. Notwithstanding several attempts to atomize without air, including adjustments in operating conditions, the experiments were unsuccessful. Even with knowledge of electrostatic break-up of liquids, those associated with the Bennett et al. patent gun were unable to successfully utilize the gun without air. Defendant could not utilize the gun without the use of air and even then such use was under conditions not taught by the formally abandoned application in the patent office as it failed to specify conditions. The evidence discloses the paint was not atomized as finely divided spray particles but were in a hodgepodge of sizes and shapes exactly as Mr. Bennett and his personnel found in their experiments and caused them to abandon their experiments without air. The Bennett et al. patent gun in any form of its teaching and the abandoned application gun of Bennett in any form of its teachings and as a single jet atomizer when operated without air do not and cannot constitute practical spray painting devices.

THE DEFENDANT'S CLAIM OF PRIOR KNOWLEDGE, INVENTION, PRACTICE AND USE OF RANSBURG PATENTS '536 AND '417 IN ISSUE BY WILLIAM AUSTIN DARRAH OF AND AT CHICAGO, ILLINOIS, AS WELL AS ELSEWHERE IN THE UNITED STATES OF AMERICA, SAID DARRAH BEING THE PATENTEE OF UNITED STATES PATENT NO. 2,362,889, GRANTED NOVEMBER 14, 1944 ON AN APPLICATION FILED FEBRUARY 5, 1942; BY GEORGE B. CRISP OF AND AT BROOKLYN, NEW YORK, AS WELL AS ELSEWHERE IN THE UNITED STATES, WHO WAS THE PATENTEE OF UNITED STATES PATENT NO. 2,369,216, GRANTED FEBRUARY 13, 1945 ON AN AP-

PLICATION FILED MAY 27, 1942; AND BY FORD C. PETHICK OF AND AT ENGLEWOOD, NEW JERSEY, AND NEW YORK, NEW YORK, AS WELL AS ELSEWHERE IN THE UNITED STATES OF AMERICA, WHO WAS THE PATENTEE OF UNITED STATES PATENT NO. 2,633,-796, GRANTED APRIL 7, 1953 ON AN APPLICATION FILED APRIL 5, 1944.

Mr. Darrah's patent discloses an apparatus and method for practicing fractional distillation. In distillation, a composite liquid containing portions or "fractions" of different volatility is heated to evaporate its more volatile fraction or fractions into gaseous form, and the gaseous distillation is moved to a surface at low temperature where it is cooled and condensed into liquid form, and the condensed distillate is collected. This is opposite to the principle of the coating art. In coating, the composite liquid material is always moved from the source to and deposited on the target as a liquid and never as a gas. The contrasting character of the techniques in distillation and coating evidences one would never be associated with the other. This art discloses that a lower boiling point fraction of liquid flowing over a heated electrode is vaporized by heat, leaves the liquid as a gas, and, while in gaseous form is electrostatically transported to an oppositely charged, cooled electrode. Unvolatilized fractions of the mother liquid run from the hot electrode and are collected, while the gaseous distillate condenses to liquid form on the cooled electrode, runs therefrom, and is separately collected.

This art does not teach that electrostatic atomization takes place, or that liquid particles are transported and deposited by electrostatic forces. Any such atomization and deposition would defeat the patentee's purpose in this art, for it would dilute the low boiling point distillate with high boiling point fractions intended to remain behind as a liquid on the hot electrode. The art does not rely upon stratification of the liquid film into layers of the volatile and unvolatile liquids on the hot electrode, as interpreted by defendant's personnel, in fact, such stratification would be contrary to known laws of nature. The art does not teach that atomization occurred from the liquid on the heated electrode. This art does not disclose a practicably usable paint spraying method or apparatus.

If the teaching of this art were followed in the coating art, all of the paint resins would be left at the source and would not be transferred to the collecting electrode. Only the solvent of the coating material would be transferred. Furthermore, the use of heat or change of temperature is contrary to the principles of practical coating.

This art is unadaptable to the coating art without the use of the teachings of the Ransburg patents in issue. It is incapable of producing a practicable spray painting device even with unwarranted alterations not taught by the asserted art. The flow of liquid was not the controlled rate of flow to the sites of atomization taught by the Ransburg patents in issue as each of the sites must be over-fed in order to provide sufficient material for all succeeding sites of atomization. The over-feeding makes the atomization unstable resulting in large particles or globs of liquid being thrown from the electrode.

Mr. Crisp's patent discloses centrifugal atomizers. The art does not apply any electrical potential to the atomizer or use of electrostatic forces in any way in atomizing or depositing paint or other liquid. The art may disclose the formation of a film on a rotating atomizer just as did the Hopkins U.S. Patent 1,861,475 which was considered by the United States Patent Office in the prosecution of both of the applications that resulted in the granted Ransburg patents '893 and '894 in issue. While atomizers employing uncharged rotating members have been known for many years, they have been little used in coating systems. However, when the rotating member is charged to create a field extending from

it to the article being coated, the result is a system which has enjoyed wide commercial use. Such disparity in the extent of use of these devices in such coating system evidences unique and unexpected results from an electrostatic coating system employing a charged rotating atomizer.

Mr. Pethick's patent discloses several ways for using electrostatic forces in the application of printing ink. The systems disclosed in Figures 1–7 are essentially an adaptation of the Ransburg "No. 1 Process" in that the spray is formed mechanically without benefit of any electrostatic effects and is mechanically projected into an electrostatic field for charging and deposition. The system disclosed in Figures 8–10 shows ink carried as preformed particles on tips of bristles on a moving belt into proximity to a moving paper web. "The small particles of ink on the ends of bristles 108" are charged and transferred to the web by electrostatic force. The Pethick patent teaches that the particles are transferred as such and contains no teaching of electrostatic atomization. It does not disclose that the gap between the bristle tips and the web is great enough to permit dispersion of the particles, even if atomization could or would occur. In these respects, the Pethick printing press resembles those of the Huebner U.S. Patents (1,-820,194), (2,224,391), and (2,451,288) which were before the United States Patent Office in the proceedings leading to the grant of the Ransburg patents '536 and '417 in issue. Also similarity between the Pethick and Huebner disclosures is shown by the existence of Interference No. 82,502 which Mr. Pethick lost.

Pethick failed to establish any conception of the subject matter to which any of the claims in this action is directed. His was a bare conception which was not shown to be followed by any reduction to practice or embodied in the disclosure of his patent and was not shown to have been publicly disclosed and is, therefore, to be regarded as abandoned.

THE DEFENDANT'S CLAIM OR PRIOR KNOWLEDGE, INVENTION, PRACTICE AND USE OF RANSBURG PATENTS '893 AND '894 IN ISSUE BY WILLIAM A. STARKEY OF ZIONSVILLE, INDIANA, EDWIN M. RANSBURG OF INDIANAPOLIS, INDIANA, AND RANSBURG ELECTRO-COATING CORPORATION OF INDIANAPOLIS, INDIANA, AT INDIANAPOLIS, INDIANA, AND ELSEWHERE IN THE UNITED STATES OF AMERICA, WHO ARE THE PATENTEES OF UNITED STATES PATENTS NOS. 2,685,-536 AND 2,794,417, GRANTED AUGUST 3, 1954 AND JUNE 4, 1957, RESPECTIVELY, ON AN APPLICATION FILED SEPTEMBER 29, 1944; AND BY THOMAS J. ARBRON OF AND AT ROMEO AND CAPAC, MICHIGAN, WHO WAS THE PATENTEE OF U.S. PATENT NO. 2,456,853, GRANTED DECEMBER 21, 1948 ON AN APPLICATION FILED JUNE 19, 1946.

The Starkey and Ransburg patents '536 and '417 do not disclose either (a) a film having a uniform leading edge, (b) atomization from spaced cusps whose spacing is affected by the field, (c) an annular film, or (d) a rotating atomizing head as taught by Ransburg patents '893 and '894. The '893 and '894 patents were allowed by the United States Patent Office with the Ransburg '536 and '417 patents before it.

The system disclosed in the Arbron patent resembles the old Ransburg "No. 1 Process" in that it embodies mechanical, mist-forming atomizers and uses electrostatic forces solely to deposit mechanically formed mist particles. The mechanical atomizer is a rotating, multiorifice spray nozzle. The particle repelling electrode is maintained at an electrical potential different from that of the nozzle and opposite that of the article to be coated, and in one (1) form is a metal disk mounted in a concentric position behind the nozzle and, if desired, ro-

tatable therewith. As the patent expressly states, rotation of the disk "is done only as a means of further scattering or diffusing the mist" created by the nozzle and in some cases "will be neither necessary nor desirable". Chief reliance for charging the spray particles is placed on "mechanical ionization" by the force of friction, created as the liquid is forced through the nozzle orifices. The patent discloses no atomization other than the mechanical atomization produced by the nozzle. It discloses no downward projection of streams of liquid toward the disk, and any such downward projection would not be consistent with the patent's teaching. Further, Arbron does not disclose or teach electrostatic atomization, positively deforming a liquid stream into a film, the existence of a film on the disk, supplying liquid to the disk at a controlled rate, or the existence of an annular atomizing zone.

Defendant's evidence of the Arbron device did not comply with the teachings of the patent. The downward projection of streams of unatomized coating material from the nozzle onto the surface of the disk finds no support in the patent and is a material departure from the teaching that a mist is created by the nozzle. Because unwarranted departures from the teachings of the Arbron patent, a model of Arbron was unable to control the deposition of the coating material whereby a great portion of the same was deposited on surfaces other than the target. Had the model been built and operated in compliance with the teachings of the Arbron patent, it would not suffer this difficulty. The operation of an Arbron model with twelve (12) pounds per square inch pressure on the liquid is also a material departure from the "high pressure" taught by the patent because such pressure is not capable of creating a mist through the size holes used in the nozzles of the Arbron model. Arbron states that "high pressure" should be used for creating the mist which in the case of the model in evidence should be twelve hundred (1200) to fifteen hundred (1500) pounds per square inch. Any

atomization of coating material electrostatically by an Arbron model was done by a model constructed and operated not in compliance with the teachings of the Arbron patent.

THE DEFENDANT'S CLAIM OF PRIOR KNOWLEDGE, INVENTION, PRACTICE AND USE OF RANSBURG PATENT '894 IN ISSUE BY WILLIAM E. CROUSE OF CARMEL, INDIANA, AND RANSBURG ELECTRO-COATING CORPORATION OF INDIANAPOLIS, AT INDIANAPOLIS, INDIANA, AND ELSEWHERE IN THE UNITED STATES OF AMERICA, WHO WAS THE PATENTEE OF PATENT NO. 2,893,893, GRANTED JANUARY 31, 1950 AND ALLEGED TO BE A CONTINUATION IN PART OF A PRIOR APPLICATION SERIAL NO. 13,174 FILED MARCH 5, 1948.

The Crouse patent '893 in no way discloses the rotating heads of the latter patent. Mr. Crouse's patent '893 was expressly acknowledged as prior art in the application which led to the Ransburg patent '894 and was considered as prior art by the United States Patent Office before allowing the application of Ransburg's patent '894.

39. The inventions set forth in each of the four (4) Ransburg patents in issue were not in all essential features old and well known prior to the invention of the Ransburg patents; they did involve patentable invention and more than the use of mechanical skill in the selection and adaptation of elements, materials and devices thereof; the elements, materials and devices of the Ransburg patents in issue and not present in or known in any art existing prior to the invention of the Ransburg patents from which anyone using mechanical skill could adapt the methods and apparatus of the pertinent Ransburg patents in issue; the differences between the subject matter of the Ransburg patents and the prior art were such that the subject matter of the Ransburg patents as a whole would not have been and were not obvious to a per-

son of ordinary skill in the art existing at the time of the invention of the Ransburg patents; and the claims of the Ransburg patents did not define mere aggregations or old or exhausted combinations, all as charged by defendant's answer.

No prior art relied on by defendant discloses a spray coating system including an elongated edge member from which charged liquid coating material is atomized at a plurality of atomizing sites so closely spaced as to form a substantially continuous atomizing zone as taught by, and contemplated in claims of, the Ransburg patents in suit.

No prior art discloses an electrostatic spray coating process in which liquid coating material is advanced in a thin film to the edge of an atomizing head, an electrical potential is created at said edge by applying voltage to said atomizing head, said electrical potential being sufficient to create an electrostatic field between said atomizing head and the objects to be coated of sufficient strength to disperse and deposit the liquid coating material on articles to be coated and atomizing liquid coating material at the point of highest concentration of the lines of force in the electrostatic field.

None of the prior art cited by defendant discloses the defendant's accused systems which employ the types A, B and C heads described elsewhere in these findings. While certain individual steps or elements may be found in some of the prior art none of the prior art discloses the combination of elements or steps utilized by the defendant in its apparatus for electrostatic spray coating of articles.

40. Ransburg's method patent 2,685,536 is for a broad, basic invention fundamentally different from any prior spray coating process of record. The subject matter defined by each of its claims is novel and involves invention over anything disclosed in prior art.

41. Nothing in the prior art cited against Ransburg patent 2,794,417 shows or suggests the coating apparatus defined by claims 3 and 4 of such patent. The prior art is no closer to the subject mat-

ter of those claims than to the subject matter claimed in Ransburg's method patent 2,685,536.

42. Claims 3 and 4 of Ransburg patent 2,794,417 are not for the same invention as that claimed in patent 2,685,536. The method covered by Ransburg patent 2,685,536 can be practiced by forms of apparatus different from any covered by claims 3 and 4 of Ransburg patent 2,794,417, for example, either of the forms of apparatus shown in Figures 1–4 of both patents.

43. The subject matter of claims 3 and 4 of Ransburg patent 2,794,417 is novel and involves invention over the prior art.

44. The Ransburg patent 2,893,893 discloses apparatus and methods which, although embodying the inventions of Ransburg patents 2,685,536 and 2,794,417, are substantial improvements over the specific forms of apparatus and methods shown and described in those earlier patents. The subject matter defined by each of its claims 1–3, 5–7, 9 and 10 is novel and involves invention over anything disclosed in the prior art.

45. Ransburg patent 2,893,894 discloses apparatus and methods which, although embodying the inventions of the three (3) earlier Ransburg patents (2,685,536), (2,794,417) and (2,893,893) in suit, are substantial improvements over the specific forms of apparatus and methods shown and described in those earlier patents. The subject matter described by each of its claims is novel and involves invention over anything disclosed in the prior art.

46. The differences between the subject matter of each claim in suit and the prior art are not such that such subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time such subject matter of the Ransburg patents was invented. No claim in suit is directed to a mere aggregation or to an old or exhausted combination.

47. The subject matter defined by the claims of the Ransburg patents in issue has filled a long-felt want, and methods

and apparatus embodying such subject matter have found wide use in industry. Plaintiff has issued over a thousand licenses to companies for use of such subject matter, including some of the largest companies in this country. Such companies have paid the plaintiff substantial fees for the right to use such subject matter.

48. The success enjoyed by the systems covered by the Ransburg patents in issue is attributable to paint savings, savings in equipment and the reduction in labor costs. While all the specific atomizers used in plaintiff's commercial spray coating systems differ in detail from the specific atomizers shown in Ransburg patents 2,685,536 and 2,794,417 in issue, the commercial systems all embody the fundamental concepts to which the claims in suit of these two (2) patents are directed, and the commercial success the systems have enjoyed is to be credited basically to the inventions those claims describe.

49. All of plaintiff's commercial uses of subject matter covered by any of the patents in suit have employed the invention defined by the claims in suit of Ransburg patent 2,893,893 and all but one (1) form of such uses in the United States of America have employed the subject matter defined by the claims of Ransburg patent 2,893,894. Stationary electrostatic atomizing heads having straight edges like that of Figures 6 and 7 of Ransburg patent 2,893,893 have had substantial use in various European countries.

50. The defendant's accused systems all use charged rotating heads which embody identical principles of operation and differ only in their specific constructional details. The three (3) heads (herein referred to as types A, B and C, respectively) are substantially as shown in Ford Drawings 56ZU2, 56ZU29 and 56ZU64.

Each of the Ford types A, B and C devices include a rotary atomizing head which is cone or cup shaped and is mounted for rotation about its axis. Each head is connected to a high voltage supply. In each device, the rotary head is mounted on a spindle which is either directly or indirectly connected to a drive motor for purpose of rotating the spindle and the attached head. During the operation of each of the types of devices, the head is oriented horizontally and the coating material is fed to the head near its axis and is spread into a film on the inner surface of the head and fed at a controlled rate to the rim by action of centrifugal force. At the head rim, the film is presented to an electrostatic field maintained between it and the grounded articles moving along a rectilinear path spaced forwardly of the head and axially thereof. Under the influence of the field, the film edge is formed into spaced cusps from the tips of which the coating material is atomized into a spray of fine charged particles. The spray is projected in a generally axial direction from the head, dispersed and deposited on the article electrostatically.

In the accused systems in most instances groups of the heads are arranged to spray horizontally toward the path followed by the articles conveyed through the coating zone. The heads of each group are spaced horizontally along the article path and are offset vertically with respect to each other so that their deposited spray patterns overlap and provide coverage for the articles over their entire vertical extent. Defendant's accused systems are used for painting steering columns, axle housings, hoods, fenders, instrument panels, shock absorbers, horns, small motors, trim parts and other small parts used in the manufacture of automobiles.

In the type A device, the rotary head has a diameter at its open end of approximately three (3) inches and is rotated at a speed of about 1,000 r. p. m. The coating material is fed to the rotating head and is atomized therefrom at rates varying from 50 to 200 c. c. per minute. The voltage applied to the heads is between 90 and 100 KV. In these systems employing the type A device, the atomizer is spaced between fifteen (15) and eighteen (18) inches from the article during coating.

The type B device comprises inner and outer rotating heads which are coaxially vested together with their edges in substantially the same plane. The outer head is six (6) inches in diameter and rotates at about 1,200 r. p. m. while the inner head is one and one-half (1½) inches in diameter and rotates at about 3,600 r. p. m. The delivery of coating material during operation of the B type device is to both cups and in the aggregate is between 50 and 100 c. c. per minute. The voltage applied to the device is 150 KV. In those systems employing the type B device, the heads are spaced twenty-seven (27) inches from the article during a coating.

The type C device comprises a single head six (6) inches in diameter which, in most instances, rotates at 4,000 r. p. m. and a voltage of 150 KV is applied to it. The feed arrangement for this device comprises a stationary tube which supplies paint into an annular trough at the extreme rear end of the head and passes forwardly from such trough through some eighty (80) feed openings into the flaring front portion of the head. The centrifugal force causes the paint to flow to the head-rim, effects distribution of the paint along that rim to form a continuous film which under all normal operating conditions is uniform for at least substantial portions of its extent.

51. All of the systems accused herein as infringements of the Ransburg patents in issue during their normal operation embody a rotating atomizing head which spreads liquid coating material fed to it at a controlled rate into a thin film and presents the edge of that film to an electrostatic field created by applying an electrostatic potential to the atomizing head while the articles to be coated are maintained at ground potential in positions spaced from the head. At the rim of the head, the electrostatic field is of liquid-atomizing strength. With the benefit of that field, the edge of the film is formed into a series of spaced cusps which spacing is affected by the field and from the tips of the cusps electrically charged particles are formed and dispersed to form a spray and are deposited on the articles by the field. At the tips of the cusps, where atomization takes place, the lines of force of the field are highly concentrated, and the field is strong. Each particle as formed, bears a maximum electrical charge as a result of which the particles are electrostatically urged to follow the lines of force of the field toward deposition on the articles.

The defendant does not contend that in the accused system neither the rotation of the heads or the centrifugal force resulting from that rotation inhibits or suppresses the effect of the electrostatic field on the film of the liquid coating material presented to the field. At all head speeds, irrespective of the type of liquid being atomized, the liquid film is electrically charged by virtue of its being the electrode in the field and the particles are atomized from the edge of the film at the point of highest field strength bearing the maximum possible electrical charge.

In the accused systems, the atomization is finer when the head is charged and the atomization takes place under the influence of the field than when the head is uncharged and there is no field at the atomizing site.

High speed photographs of the accused charged atomizing heads rotating at normal operating speeds in a spray painting operation exhibited substantial differences in respect to cusp shape and particle formation when compared with high speed photographs of the same heads rotating at the same speeds in an uncharged condition. The cusp and particle formation when the rotating head of all the accused devices is charged is identical in character with the cusp and particle formation on a non-rotating charged head.

All three (3) types of devices as used in the accused systems, depend on electrostatic atomization of coating materials and the centrifugal force serves to feed the coating material to the tips of the cusps. The atomizers in all types of accused systems have been operated by the

defendant under conditions which, at most, merely added centrifugal force to the atomizers disclosed in the patents in suit while retaining all the features and the benefits of the features recited by the asserted claims of those patents.

Plaintiff's and defendant's developments do not represent divergent approaches to the same problem. Defendant's evidence fails to establish that any accused device had even been conceived until after Ransburg's "No. 2 Process" had become known to it. As shown in a graph proposed by defendant's expert and comprising the last page of his report submitted to defendant's house counsel, the charged rotating heads in all three (3) types of accused devices rotate at speeds well below that which, in the absence of the field, would produce acceptable atomization.

52. Nothing in any of the Ransburg patents in issue, in the file wrappers thereof, or in the prior art limits any claim in suit to exclude any of the defendant's accused systems.

53. The acts of the defendant complained of by the plaintiff have been performed in the United States subsequent to the issue date of each of the Ransburg patents in issue and are continuing, including defendant's regular and established place of business at 6900 English Avenue, Indianapolis, Indiana, within the jurisdiction of this Court.

54. Defendant has realized substantial savings from the use of the accused airless electrostatic spray coating systems which are admittedly close copies of Ransburg's "No. 2 Process". The accused system employing the type A device of defendant's accused system for the years 1956 through 1962 has profited the defendant substantially by savings in the paint used. Defendant has also realized additional savings from the use of systems employing the type B and C devices.

55. Each of the defendant's accused systems responds fully and in every respect to all requirements of every claim of Ransburg patent '536 in issue.

Each of the defendant's accused apparatus responds fully and in every respect to all requirements of each of the claims 3 and 4 of Ransburg patent '417 in issue.

While the specific atomizing heads shown in patents '536 and '417 all possess features such as spaced orifices, needles, or wire-turns serving to divide or concentrate into more or less discrete droplets, the liquid coating material presented to the field, none of the asserted claims of these patents is limited to that particular method or means for presenting the liquid coating material. Infringement of those claims is not avoided by feeding the liquid coating material to the field in the form of a uniform film and allowing it to be formed into spaced cusps under the influence of forces acting beyond the periphery of the head.

Nothing in Ransburg method patent '536 in issue, in its prosecution before the United States Patent Office or in the prior art, requires any of its claims to be limited to exclude the method practiced in operation of each of the defendant's accused systems.

Nothing in Ransburg apparatus patent '417 in issue, in its prosecution before the United States Patent Office or in the prior art, requires either of its claims 3 and 4 to be limited to exclude any of the defendant's accused apparatus.

56. Each of the defendant's accused systems responds fully and in every respect to all of the requirements of each of claims 1–3, 5–7, 9 and of Ransburg patent '893 in issue.

While all the specific atomizers shown in Ransburg patent '893 in issue with the exception of that of Figure 8 form the film of coating material by the use of an elongated narrow slot, none of the claims 1–3, 5–7, 9 and 10 of the Ransburg patent '893 in issue is limited to the use of such a slot.

Nothing in Ransburg patent '893 in issue, in its prosecution before the United States Patent Office or in the prior art, requires any of its method claims 1–3 and 5–7 to be limited to exclude the method practiced in operation of each

of the defendant's accused systems or either of its apparatus claims 9 and 10 to be limited to exclude any of defendant's accused apparatus.

57. Every accused system as operated by defendant responds fully and in every respect to the requirements of each of the claims 1–8 of Ransburg patent '894 in issue.

Nothing in Ransburg patent '894 in issue, in its prosecution before the United States Patent Office or in the prior art, requires any of its method claims 1–6 to be limited to exclude the method practiced in the operation of each of the defendant's accused systems or either of its apparatus claims 7 and 8 to be limited to exclude any accused apparatus.

58. Ransburg patents '536 and '417 were not mistakenly granted by the United States Patent Office under a misapprehension or erroneous belief and it did not entertain any misapprehension or erroneous belief as to the operativeness of the embodiments and structures disclosed in those Ransburg patents in issue. The United States Patent Office was not under any misapprehension or erroneous belief that the apparatus and methods used commercially by plaintiff's licensees were those, or any of those, specifically shown and described in the patents. The affidavits filed in the United States Patent Office by and on behalf of the patentees contained no false or misleading statements, and no pertinent information was withheld from the United States Patent Office.

Each of the five (5) affiants (whose affidavits were filed in the United States Patent Office) were called as witnesses by the defendant. Each stated his affidavit was true and accurate or that the statements therein were either written by him, or if written by others, he was given the opportunity to make such corrections as were necessary.

Plaintiff made full disclosure to the United States Patent Office of the Ransburg "No. 2 Process" including the filing of a copy of its first brochure which illustrated and described the Ransburg "No. 2 Process" and commercial forms of equipment for practicing the process within two (2) months after its public announcement of the Ransburg "No. 2 Process". Such brochure was received on September 19, 1951 in the United States Patent Office Division 25, which was in charge of, and later allowed, the application for all four (4) Ransburg patents in issue. The United States Patent Office was aware of and considered such with the affidavits in question.

The plaintiff in no way misrepresented the commercial form of the Ransburg "No. 2 Process" and the apparatus for practicing the same to the United States Patent Office.

59. Pending this action, the Court encouraged the parties to discuss compromise and settlement. After the decision by the Fourth Circuit Court of Appeals in the case of Ransburg v. Proctor and Ionic, (referred to in finding eight (8)) which concerned the four (4) Ransburg patents in issue, the official representatives of plaintiff and defendant and their attorneys met in Chicago, Illinois, to explore compromise and settlement. Ransburg refused to accept defendant's proposal to settle with regard to some of the four (4) patents in issue but not with regard to the others. All four (4) Ransburg patents in issue are infringed by defendant's accused systems. Under such a proposed settlement, Ransburg would be settling only a portion of this action. It is uncontroverted that plaintiff has never required defendant or any licensee, as a condition of receiving a license, to take or pay for any license under any patent which would not apply to the process described under the license agreement.

Plaintiff's license agreement forms do not identify specific patents under which the user is licensed but grant a right or license to use an identified process to coat particular items in accordance with specifically designed systems shown in identified drawings.

Plaintiff's license agreements are terminable by the licensee upon thirty (30) days notice. The license agreements of-

fered to the defendant in such compromise and settlement negotiations in October of 1963 were Ransburg's standard license agreements and were the same as offered to licensees prior to June 16, 1959.

60. The trial was vigorously prosecuted and defended. The Court does not deem it appropriate or necessary to refer to the credibility of witnesses and evidence decisions reached by the Court in order to find the facts in this case. There were in excess of thirty (30) days of evidence some of which was conflicting and had to be weighed by the Court.

61. This Court having found that the four (4) Ransburg patents in issue are valid and infringed by the defendant for an exceedingly long period of time does not deem it necessary to reach the issue of wilful and wanton infringement on defendant's part. The issue is confined to the plaintiff's request for relief by an injunction and findings of wilful and wanton infringement will serve no useful purpose. The injunction relief at this stage of the proceeding is a final and permanent relief and under the facts of this case no determination of the alleged wilful and wanton infringement is necessary.

 The defendant has no intention of discontinuing the defendant's accused infringing systems. The plaintiff is affected by the defendant's unlicensed use of the plaintiff's patents in issue in that industry in general is aware of defendant's conduct and plaintiff is deprived of the full potential of the market for the Ransburg patents a part of which is permanently lost or affected. The plaintiff has been and will in the future be irreparably damaged unless the defendant is enjoined from unlicensed use of the plaintiff's patents.

The public interest requires that the defendant be accorded sufficient time to effect an orderly change over in its painting installations without disrupting the economy of the country and of a substantial segment of the population of the United States. The Court finds that such orderly change over can be made within six (6) months time with a minimum of damage to others. The plaintiff has no adequate remedy at law to prevent defendant's continued violation of the plaintiff's rights secured by its patents in issue.

62. The Court retains jurisdiction of this action for the determination of the issue of damages including a supplemental complaint for damages from the date of the original complaint to the date of the trial inclusive of the damages for any infringing use during the period of the change over of the defendant's painting installations.

63. Every conclusion of law deemed a finding of fact is hereby adopted as a finding of fact.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and subject matter of the action. The Court's jurisdiction is based on Title 28 U.S.C.A. § 1338(a) in that the pleadings and evidence in this case directly relate to four (4) United States Letters Patent issued by the United States Patent Office under authority of an Act of Congress of July 19, 1952, Chapter 950, 66 Stat. 792 et seq., as amended, (Title 35 U.S.C.A. § 1 et seq.) and directly relate to the remedies authorized under an Act of Congress of July 19, 1952, Chapter 950, 66 Stat. 792 et seq., as amended (Title 35 U.S.C.A. § 1 et seq.).

2. The plaintiff has maintained the burden of proof of the essential elements and the alleged facts thereof of the plaintiff's amended complaint by a preponderance of all of the evidence.

3. The defendant has failed to maintain the burden of proof of the essential elements and the alleged facts thereof of defendant's affirmative defenses and each of them by a preponderance of all of the evidence.

4. The law is with the plaintiff and against the defendant on all issues of the pleadings.

5. United States Letters Patent 2,685,536 is valid in all respects.

6. United States Letters Patent 2,794,417 is valid in all respects.

7. United States Letters Patent 2,893,893 is valid in all respects.

8. United States Letters Patent 2,893,894 is valid in all respects.

9. Defendant's making and using the method and apparatus taught by the four (4) Ransburg patents in issue and referred to in conclusion of law items five (5), six (6), seven (7) and eight (8) infringed and infringes each of such patents in violation of Title 35 U.S.C.A. § 271(a).

10. The plaintiff was not guilty of the unclean hands charge made by defendant.

11. The plaintiff was not guilty of the package licensing charge made by defendant.

12. The plaintiff is entitled to the injunctive relief requested which injunction will be made effective six (6) months from this date against the unlicensed use of the four (4) Ransburg patents in issue.

13. The plaintiff is entitled to an accounting to ascertain the amount of damages sustained by the plaintiff as a result of the infringement by defendant of each of the Ransburg patents in issue.

14. The plaintiff is entitled to a judgment for the damages so ascertained and a determination of whether or not such damages should be increased three (3) times, interest should be awarded with costs and attorneys' fees as provided in certain cases within the provisions of Title 35 U.S.C.A. §§ 284–285.

15. The Court retains jurisdiction of the action for the trial of the undetermined issues and the cause is continued pursuant to Rule 42(b) of the Federal Rules of Civil Procedure.

16. Every finding of fact that is deemed a conclusion of law is hereby adopted as a conclusion of law.